## MURRAY CO. v. E. VAN WINKLE GIN & MACHINE WORKS.

(Circuit Court, N. D. Georgia.  June 2, 1910.)

PATENTS (§ 328*)—INFRINGEMENT—FEEDER FOR COTTON GIN.
   The Murray patent, No. 472,607, for an improvement in apparatus for
   elevating, distributing, and feeding seed cotton to gins, the novel feature
   of the combination being an automatic valve produced by the cotton itself
   which prevents choking in the chute, *held* not infringed upon evidence
   showing that the patented combination will not work successfully without
   the use of a trip valve, which has been added as a new element in defendant's machine.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by the Murray Company against the E. Van Winkle Gin & Machine Works. Decree for defendant.

Oliver Mitchell, J. J. Eckford, and Smith, Hammond & Smith, for complainant.

Wimbish, Watkins & Ellis, for defendant.

NEWMAN, District Judge. This is a bill brought by the complainant against the defendant to enjoin the latter from the infringement of letters patent No. 472,607, issued by the Patent Office April 12, 1892. The patent which it is claimed the defendant company has infringed is for a "new and useful improvement, in apparatus for elevating, distributing and feeding seed cotton to gins." The claims of the patent which are alleged to have been infringed are Nos. 1, 2, 9, and 12 of said letters patent No. 472,607. Those claims are as follows:

One:

"In apparatus for elevating, distributing and feeding seed cotton to gins, the combination, with a suction pipe or tube, of a box or casing having side air-passages and a central screened space, and a chute or feeder communicating with said space, substantially as described."

Two:

"In apparatus for elevating, distributing and feeding seed cotton to gins, the combination, with a suction pipe or tube formed in its under side with an opening, of a box or casing having a central space communicating with said pipe or tube and provided with side air-passages having inner screen-walls and a chute or feeder communicating with said central space, substantially as described."

Nine:

"In apparatus for elevating, distributing and feeding seed cotton to gins, the combination, with the chute or feeder of a set of feed rollers supported at the bottom of said chute or feeder, and means for regulating the feed of said rollers, substantially as described."

Twelve:

"The combination, with a suction pipe, of the box or casing constructed of two or more central spaces and provided with the screened air-passages and a chute or feeder suspended beneath each of said central spaces, substantially as described."

Complainant then sets up in its bill, and relies upon a decision by the Circuit Court of Appeals for the Third Circuit in Murray Company v. Continental Gin Company, reported in 149 Fed. 989, 79 C. C. A. 499, which decision enjoined the infringement of claims Nos. 1, 2, 9, and 12. Complainants insist that this case should be followed here.

Complainant also relies upon the decision in the Circuit Court for the Northern District of Texas in the case of Murray Company v. Ray et al.[1] for the infringement of letters patent No. 472,607. In that case a preliminary injunction was granted by the court against the infringement of claims Nos. 1, 2, 9, and 12 of the same letters patent. Complainant, alleging that the defendant is infringing claims

[1] No opinion. Case dismissed by agreement.

1, 2, 9, and 12 of this patent No. 472,607, prays for an injunction restraining the defendant, its agents, servants, and employés, from making, using, or selling any apparatus or machines containing and embodying the invention covered by said patent claims Nos. 1, 2, 9, and 12. It then prays for an accounting of the profits which defendant has realized from the use of its invention. Discovery is waived.

The answer denies the validity of the patent, and claims that the state of the art was such at the time letters patent No. 472,607 was issued as that there was no invention, but merely an aggregation of well-known mechanical appliances, and that an apparatus made under the patent sued on would not perform the functions claimed for it by the complainant. The defendant also claims in its answer that the elevator manufactured by it is made under patents owned by the defendant and regularly issued by the Patent Office. As to the case of Murray Company v. Continental Gin Company, the defendant in its answer claims that in that case the Murray Company contended that its apparatus claimed to be made under the patent described in its bill contained an automatic valve produced by the seed cotton itself, and claimed that its apparatus for elevating, distributing, and feeding seed cotton to gins was automatically regulated by the seed cotton.

Defendant claims that certain language used in the opinion in the Continental Gin Company Case shows that the complainant there relied upon having an apparatus containing a new element of automatic regulation by seed cotton itself, and upon information and belief denies that said complainant has such an apparatus, and denies that the apparatus of complainant is automatically regulated by the seed cotton itself, and says, if complainant has an apparatus regulated automatically by the seed cotton itself, that the apparatus used, manufactured, and sold by this defendant is not so regulated, and is therefore not an infringement of complainant's apparatus. Defendant further denies that at the time alleged in the bill, nor at any other time, did it make, use, or vend any new and useful improvement in apparatus for elevating, distributing, and feeding seed cotton to gins containing and embodying the invention set forth and claimed by said letters patent, or that it has in any way infringed upon the exclusive rights, if any, or any rights of complainant's, and denies that it has derived, or realized, any profits which complainant would have derived from his alleged exclusive rights, and denies that complainant is deprived of any royalty, or has incurred any damages by any unlawful or wrongful acts of this defendant. Defendant then sets up that it is the owner of patent No. 777,024, originally issued to James Theodore Jackson, of Corsicana, Tex., on the 6th day of December, 1904, and thereafter regularly and duly assigned to this defendant; that it is the owner of patent No. 823,858, issued June 19, 1909, to Thaddeus S. Grimes, assignor, to Edward Van Winkle, which patent has been by duly executed assignments assigned to defendant; that under patents previously obtained and expired, and using devices not patented or patentable, and under said patents, and by virtue of its right to so do, this defendant has for more than three years manufactured and sold its present apparatus for elevating and feeding

seed cotton to cotton gins, which apparatus of defendant contains nothing that infringes any right of complainant, and which apparatus is not controlled by the seed cotton, and contains the same general principles in use by said defendant since 1886.

Defendant then sets up that its apparatus is controlled by a valve so arranged as to work automatically by the same force that drives the fan, opening and closing as often as desired by reason of a machine device operated by a driving pulley, and which may also be operated by hand. The device for controlling the seed cotton in its being fed to the gin, being in no way mechanically controlled or regulated by the seed cotton itself, the device of this defendant operating whether or not there is any seed in the machine at the time it is being operated, and cutting off the feeding of the seed cotton at stated times, which can be regulated by the machinery, but not by the cotton; the device, whether singly or in combination used by the defendant, not being in conflict with any new or patentable device used by the complainant in the patent sued on.

Several interesting questions were raised on the argument of this case, and also in the very well prepared briefs filed since the argument by counsel for both complainant and defendant. The principal question in the case, however, and that to which the argument has been mainly directed, and upon which the case seems to turn, is whether or not the perpendicular chute for lowering the seed cotton in the gin is as described in the complainant's patent, and constructed under it, a practical device; that is, one that will work in practical operation. The claim is that the weight of the seed cotton is sufficient at a reasonable height in this chute to cause it to overcome the suction which keeps the valves at the lower part of the chute closed; and, when so overcome, the claim is that the cotton descends through the opening in the valve caused by its own weight, and passes on over the rollers into the gin. The complainant claims that this would be accomplished satisfactorily, and the defendant, that it would not.

A further material feature of the complainant's apparatus insisted upon here is a screened space arranged in complainant's apparatus, below the cotton suction pipe, which, it is claimed, acts to prevent any choking of cotton in the horizontal portion of the suction pipe over the gins because the cotton acts automatically by covering the screen in the chutes. The claim is that the apparatus is thus controlled automatically, this automatic regulation secured by the cotton itself covering the screened space in the chute. The contention for the defendant is that, in order that the weight of the cotton should overcome the suction of the valve, the cotton must rise to a height in the chute, which would make it impracticable to use such chutes on account of their height in an ordinary cotton ginning establishment. The defendant further says that, in order to work satisfactorily, it is necessary to have in the chute what is called a trip valve, which closes the chute, stops the suction, and allows the cotton to descend by gravity from a point below the trip valve, the valve at the bottom dropping open when the suction is withdrawn. This trip valve as defendant has it on the machine, which is claimed to be an infringement, opening and shutting at regular intervals, is attached to, and

operated by, the gin machinery. As a matter of fact this trip valve is used by both the complainant and the defendant in the apparatus they now manufacture and sell.

Which of the respective contentions is true? And, if the defendant is correct, does the trip valve differentiate the apparatus sufficiently to defeat the claim of infringement, and will complainant's apparatus work satisfactorily without the trip valve? Tests made by both parties are described in the evidence, and discussed principally by Mr. S. D. Murray for the complainant, and Mr. James S. Shields for the defendant.

An extract from the testimony of Mr. S. D. Murray is as follows:

"Q. * * * A. The apparatus was constructed especially for the test, the purpose being to make it work, as called for or as claimed in the patent specifications, excepting that in the patent specifications it speaks of a depth of 15 inches of cotton over the canvas valve being required, whereas this apparatus was constructed of sufficient length to determine just what the facts would be as to the depth of cotton required in this experiment. The chute from the bottom of the cotton pipe down to the lower end measured 11 feet, as I remember it. The canvas valve was placed directly at the lower portion of the chute, the lower edge of the canvas valve being even with the lower edge of the chute, the upper edge of the canvas valve standing two feet above the lower edge. The boards forming the chutes are made smooth on the inside and varnished to cover up any unevenness or roughness of the boards, and the lower portion of the chute is a little wider from front to back so that the cotton can come down easier. The glasses shown in the front portion of the chute are put in even with the inside walls of the chute so as to leave them flush—when I say flush, I mean substantially so—so as to leave there no impending recess to check the downward movement of the cotton. We took all the precaution in building this machine that any one versed in the art would naturally take in building a machine designed for the cotton to force its way down by gravity in opposition to the external air pressure upon the canvas valve. The connection from the elevator to the fan is a sheet iron pipe passing through a hole in the wall of the ginnery and to a 35-inch fan on the inside of the ginnery. The 35-inch fan which we had there for causing the suction in a four-gin outfit which we had in operation in that house in the ginnery. There was no valve trip in the pipe or connected with the cotton supply by means of an iron pipe. The rollers are supported at the bottom of these chutes and means for actuating the feed rollers are supplied by a feeder, cotton gin feeder, set to one side, and which was driven by a belt from the line shaft on the inside of the ginnery. This cotton gin feeder was used merely as a convenient means of getting the regulative devices on it to use in regulating the speed or movement of the feed rollers in the bottom of the chute. The regulating device referred to is on the right-hand side of the feeder, and does not show in this picture. When a large amount of cotton was first carried and piled as shown on the right-hand side of the picture, piled about the intake end of the cotton pipe and when the fan was started in operation, the cotton was fed to this pipe. The cotton was drawn into the chute of the apparatus, and settled down in the chute upon the canvas valves, which were, of course, drawn in close by the suction. The cotton accumulated upon these canvas valves before the weight of the cotton opened the canvas valves and passed down by them onto the feed rollers. Then the feed rollers were started by throwing the feeder gear on the right-hand end of the feeder, shown in the picture, in action, and the feeder changed speed mechanism was fixed at a point of speed that was sufficient for feeding cotton gins at a maximum feed. This action was kept up for a period of 20 minutes or more time; that is, the apparatus continued to run, the suction drawing the cotton into the top of the chutes, and the feed rollers paying it out at the bottom of the chutes, and the picture shows just how the apparatus looked when in operation. After the quantity of cotton or pile of cotton that was around the intake end of the suction pipe was all fed in, then baskets were used to carry the cotton away from the lower portion of the chute where it had been paid

out, out of the chutes back to the supply pipe, and this was kept up for the period of time as stated, 20 minutes or more, and finally, after this period of time, we stopped feeding cotton to the suction pipe, but allowed the suction to continue and allowed the feed rollers to continue paying the cotton out of the lower portion of the chutes, and the cotton continued to flow downward and be paid out or drawn out by the feed rollers until it had reached a depth, a vertical depth above the canvas valves of three feet and four inches. Then the canvas valves drew up by the suction and stopped any more cotton from flowing past them. The canvas valves, however, in drawing up, drew up above a portion of the cotton in the lower part of the chute; that is, the canvas valves in drawing up left some of the cotton at the lower portion of the chute still to be discharged, so that, when the canvas valves drew up closed by the suction, the cotton stood above the canvas valves as stated, three feet and four inches. This was the end of our test.

"Q. Right there I wish to ask: After you ceased to feed the seed cotton at the source of supply, and the cotton dropped down in the chute to what distance? A. The cotton dropped down into the chute to a distance of three feet and four inches above the canvas valves.

"Q. Is that the time you apply valve 27, or some equivalent? A. The time to apply valve 27 is shortly before that time, so that the feeding can go on. That is so that the feeding can go on or the cotton go down to a point where the valve 27 would not be stopped in closing by the cotton; that is, the cotton must get down below the valve 27, and then as soon as that occurs valve 27 can be closed, cutting off the suction from the lower part of the chute and allowing the cotton to continue on passing out of the chute, and in the meantime the next bale would be coming in on top of valve 27, to be ready to be discharged downward in the chute as soon as that below valve 27 has been all ginned out, so that there would be no time lost between the ginning of one bale and another and the separation would be perfect unless the cotton resting upon the feed rollers would all go out, and there would be no appreciable slacking until it had all gone out, and there would be no need of any loss of time between one bale and another. The custom, however, is in ginning to lose sufficient time to allow the press boxes to be operated, or, rather, to be moved, to allow the press that is filled to be turned away and the new emptied press or press box brought into position to receive the next cotton.

"Q. In changing from one supply of cotton to another, say of different characters of cotton or different persons' cotton, is there always some little time elapses before one moves out and the other moves in? A. No; the wagons are always,   *   *   *   where the business is conducted with a view of no loss of time, the wagons are kept at the suction pipe so that there would be no need of loss of time from the wagons not being in position. The only loss of time, that is as I stated a minute or less time, that is generally consumed in arranging the press box or baling apparatus to receive the new lot.

"Q. Well, the press box has nothing to do with this? A. There is absolutely no necessity for any loss of time in the elevator part or in the elevator itself. One bale can follow another in quick succession without the perfect separation of one bale from another. That is a characteristic of the Murray elevator that is well known everywhere."

An extract from the testimony of Mr. James A. Shields concerning the test made by him is as follows:

"Q. Did you ever test it? A. I have.

"Q. When? A. I tested it several days ago.

"Q. Was anybody present when you tested it? A. There was.

"Q. Who were they? A. You were present, and Mr. John M. Hooks was present, and Mr. W. L. Wallis was present, and my assistants in showing the operation.

"Q. Did you use cotton in that test? A. I did.

"Q. What kind of cotton did you use? A. Seed cotton, ordinary seed cotton.

"Q. Was it dry or wet? A. It was dry. I had had it in the warehouse. I keep cotton there for experimental purposes the year round. This is cotton I bought last fall. I have had it there in the factory, in sacks, since that time, and it had become very dry.

"Q. Is it such cotton as is ordinarily used in the ginning of cotton? A. It is.

"Q. What happened when that chute became filled up to the top of the screen 8? A. The telescope refused to take any more cotton.

"Q. Did you continue operating the fan? A. I did.

"Q. How long? A. Thirty minutes.

"Q. During that 30 minutes did the flexible valve 25 turn loose the cotton, and let it drop into the feeder? A. It did not.

"Q. Why didn't it turn it loose? A. Because the atmospheric pressure against the flap valve was greater than the weight of the cotton pressing downward in the chute, and wouldn't allow the cotton to force its way down, and the current of air being continuous from the fan held the flexible valves intact, and it was impossible for it to get loose from it.

"Q. Do you make that statement based upon your theory as to the operation of it, or upon your actual experiments with it? A. My actual experiments.

"Q. S. D. Murray, testifying for the complainant in this case, testified that, when the cotton was filled in the chute, to a height less than the top, the weight of the cotton would be sufficient to open the flexible valve 25, and let the cotton drop down into the feeder. From your experience with this machine, is that true? A. It is not true. (Counsel for complainant objects to the foregoing as not a correct statement of the testimony of Mr. Murray.)

"Q. In the patent of Mr. Murray, he says: 'The falling cotton will accumulate upon the flexible valves 25 until it has acquired a vertical depth of say fifteen inches, at which depth the weight of the cotton begins to overcome the atmospheric pressure on the flexible valves, and, pushing these valves out of the way, the cotton will fall down on the rollers 15 and 16.' From your experience with the apparatus that you have described is this description read by me from the patent of S. D. Murray correct? A. It is not correct.

"Q. What depth of cotton in your experiment did you have in the chute? A. I had about 38 to 40 inches.

"Q. Above the flexible valves? A. Above the flexible valves. I want to say there now, I, of course, have not measured that distance, but I had all of the space above the flexible valves that the elevator would bring cotton into, and it was about 38 to 40 inches above the flexible valves.

"Q. Did that depth of cotton overcome the air pressure on the flexible valves, and push those valves out of the way of the cotton, and let it fall down on the feeder? A. It did not. I will say that I took my hand and tried to pull the flexible valves down to see how much it lacked of doing what Mr. Murray claimed, and I found quite a resistance offered by trying this with my hand. I have the cotton gin in operation, and can demonstrate this at any time to any one.

"Q. Have you ever seen any of the Murray Company's apparatus put on the market without the trip valve, or the cut-off valve? A. I never have.

"Q. From your experience as a mechanic and as an expert, and from your experience with this particular apparatus, state whether or not the S. D. Murray patent No. 472,607, as patented, without the cut-off value, would operate? A. It would not. It might drop a little cotton. It would drop the cotton down in there, but with that flexible valve he might fill that, might make that chute long enough to put enough cotton on there that would weigh enough to overcome the atmospheric pressure on the flexible valve, to cause the valve to open and discharge the cotton, provided he built the thing high enough, but when that cotton had reached a point in depth above that flexible valve, about 38 or 40 inches above, it would then stop delivering, and the balance of the cotton would remain in the elevator.

"Q. And when would it be discharged? A. Never, unless assisted by some other means.

"Q. If the chute were made long enough to first begin to take in, and continue to take in cotton until the weight of the cotton pressed it open, what would the gin be doing while that amount was being accumulated in the chute? A. It would be standing idle, doing nothing.

"Q. Then, even if the chute were made long enough for the weight of the cotton to press open the valve 25, would that be a practical machine? A. It would not, for this reason: Cotton is brought to the ginhouse in wagons, usu-

ally about 1,500 pounds of seed cotton, and practical outfits are supposed to commence on a farmer's bale of cotton, and take it up into the elevator, and through the elevator and transmit it to the feeders, and from the feeders to the gin, and to the press, and give that farmer back all of the cotton that he had brought in that wagon. Farmers in bringing cotton to the ginhouse—one farmer will bring in a bale of cotton that has been excellently picked, carefully picked, by careful hands, and he has a very fine grade of cotton. Possibly his neighbor will bring a bale of cotton that is just picked out most any way, leaves and trash and off the ground, and so on, and there might be a man come in with the finest grade of seed cotton that is brought to the gin, and the next man the poorest. We will use that as an illustration to show the inability of this machine operating without the trip valve, the cut-off valve. We will get the man with the good cotton. He will commence to feed in, and the chute is long enough that, by gravitation, the seed cotton will press down this flexible valve 25, and cause it to open and discharge into the valve 25 into the feeder as long as the cotton was fed in sufficient quantity from the wagon to keep the altitude of the cotton in that chute to the point where the weight of the cotton would overbalance the atmospheric pressure on valve 25, and, if he continued to feed enough entirely through the bale, that machine would operate as Mr. Murray claims until the wind-up of that bale of cotton, taking the last lock of cotton out of the wagon into there, and when the cotton would reach a point of only 38 or 40 inches, as I have shown, about 38 or 40 inches, as shown by the operation at our factory, the atmospheric pressure on the valves would then hold the balance of the cotton in that chute, and the man who had brought a fine bale would leave that much of it in there for the other fellow to get in with his poor bale of cotton, to be spilled in on it, mixed, unless they opened up the machine by hand, or some other process, and took it out by hand or by some other means than is provided for in the machine, and as described in the patent for taking it out. * * *

"Q. How frequently does that trip valve open and shut in use? A. We vary the opening and shutting of that trip valve to suit the conditions.

"Q. About what is the average time it is set to open and shut? A. About once in a minute to two minutes.

"Q. Can you set it so it will open oftener than that? A. We can.

"Q. Then from the time you start the elevator cotton will reach the feeder as quickly as that opens? A. Yes, sir.

"Q. If it is set for 15 or 20 seconds, you can go and begin ginning cotton in 15 or 20 seconds? A. Yes, sir; in 15 or 20 seconds.

"Q. If you didn't have that cut-off valve, you would have to wait until the chute filled up enough? A. Entirely up, so as to overcome the atmospheric pressure on the flexible valve 25, so as the weight of the cotton in the chute would be sufficient to press itself down."

Mr. James A. Shields, being recalled the next day, was questioned, and answered as follows:

"Q. Mr. Shields, on yesterday you testified that in the test you made of the Murray apparatus now at the Van Winkle Gin & Machine Works the cotton above the flexible valve 25 was at the time of the test 38 to 40 inches deep. Have you made any measurements since then as to the exact depth? A. I have, and I find that I was in error as to the 38 to 40 inches. It is from about 28 to 30 inches in depth above the flexible valve. * * *

"Q. Does the apparatus built by the Van Winkle Company include a cut-off? A. It does. You mean a trip valve?

"Q. A trip valve? A. It does.

"Q. What purpose does the trip valve serve? A. It serves the purpose of cutting off the suction from the elevator; that is, cotton that has reached the chutes in this elevator above the flexible valve 15, when this suction is cut off, the flexible valve will release itself, and allow the cotton to pass down into the feeder below this chute."

The testimony of Mr. Murray is supported substantially by two gentlemen who were present at the test, Mr. H. G. Patterson and

Mr. George T. Loutitt. The testimony of Mr. Shields is corroborated by that of Mr. W. L. Wallace, Mr. W. H. Henderson, Mr. J. T. Terry, Mr. F. M. Scott, and Mr. John M. Hooks, who were present at the test.

After going carefully through the evidence in this case, and considering thoroughly the respective arguments, it seems to me that the complainant has failed to maintain its proposition that the Murray apparatus will work as claimed in the particular respect to which the above testimony has been directed; that is, it appears to me that it will not deliver the cotton through the chute in the manner claimed, opening by its own weight and by gravity the valves at the lower part of the chute, and passing the cotton through. It appears from the evidence that the use of the trip valve in the chute is essential to a practical operation of the feeding apparatus. If this trip valve in the chute is necessary to a practical operation of the apparatus, it would seem to be such a distinguishing and differentiating feature as to relieve the defendant company from the charge of infringement. Confessedly the Murray patent is a combination of old elements; the claim being that the combination is such as to produce a new and useful result. That the defendant may take the old elements and combine them with a new device the trip valve, so as to make it a more satisfactory and effective apparatus, and to accomplish better results, would seem to be unquestioned. The claim of the complainant company is that its apparatus is cotton regulated, that it works automatically, the cotton delivering itself by its own weight as stated. This claim of automatic cotton regulation in connection with the effect of the screened space at the upper end of the chute I understand to be the basis and the main element of patentability claimed by the Murray company for its apparatus. The defendant company does not claim this at all, as I understand it, but claims and insists that the trip valve is absolutely essential and necessary to the regular and satisfactory delivery of the cotton through the chute to the gin.

One of the witnesses for the complainant, Mr. J. H. McDonald, president of the complainant company, in his testimony states with reference to the operation of the Van Winkle gin:

"Q. Have you ever examined the elevator manufactured by the Van Winkle Company to see whether it is cotton regulated or not? A. I saw the one working in the Farmers' Union Gin Company plant at Lancaster.
"Q. Is it regulated by cotton? A. I think not."

And the whole testimony is to this effect.

In the case of Dudley E. Jones Company v. Munger Cotton Machine Company, 49 Fed. 61, 1 C. C. A. 158, decided in the Circuit Court of Appeals in this Circuit, in the opinion by Judge Locke, it is said:

"But it appears to us plain that the functions of that element, the feeding of the cotton to the gin, after being cleaned, is not performed in the same manner in the defendant's machine as in complainant's. The one operates by maintaining the current; the other by interrupting it. The one requires and maintains a comparative vacuum. The other requires for its operation the destruction of the vacuum. The one feeds regularly and continuously, the other by entirely different means feeds intermittently. In short, in construction, operation, and result there is a decided difference between the 'means for

delivering the cotton from the conveyer to the gin,' as claimed in complainant's second claim, and the apparatus used by the defendant in discharging the cotton from 'the receiver.' In combinations the doctrine of equivalents is construed most strongly against him who alleges an infringement, and each party is held to his own element or device, or a positive and exact equivalent which performs the same functions, in the same manner; the burden being upon complainant to show this. In this case we cannot consider that the flexible expanding valve of the defendant opened and closed by the automatic arrangement of the second valve with the chain belt and catch links is an equivalent of the rotary valve of the complainant, and we must find the charge of infringement has not been sustained, and the bill must be dismissed, with costs.".

This was a test between the R. S. Munger patent No. 308,790, granted December 2, 1884, and the B. A. Sailor patent, No. 362,041, granted April 26, 1887, in which, reversing the judgment of the Circuit Court, the Circuit Court of Appeals held that the Sailor patent was not an infringement on the Munger patent. Certainly at the time application was made for the Murray patent there was nothing new in the use of a chute, nor was there anything new in the use of the flexible valve. It was the automatic regulation in delivering the cotton that was claimed to have been brought about by Murray's new combination of old elements.

In the case of Dudley E. Jones Company v. Munger Machine Company, supra, Judge Locke further said:

"The first question presenting itself for consideration is whether this patent is for a combination of well-known elements which had been in common use, and therefore not patentable, unless shown to be a useful and novel combination, or whether there is entering into it any novel and newly-invented device. Taking each element separately, and examining the prior patents, we find that the pneumatic tubes have been known and used for years in various forms and for various purposes, and have been found as an important element. In patent of Johnson, No. 56,948, and Von Schmidt, No. 185,600, the pneumatic tube was used for dredging purposes; in that of Beach, No. 96,-187, for conveying letters, parcels, and other freight; in that of Penman, 124,-851, for conveying wool; in that of Pearce, 168,282, for conveying cotton; in those of Taggart, 213,709, and Reynard and De la Haye, 219,019, and several others for conveying grain. The telescopic drop-pipe claimed in the claim No. 4 can only be considered as an equivalent for an extension of said pneumatic conveyer in another form, and would not be patentable for novelty; the flexible joint being but an equivalent for any other means by which the pipe or conveyer could be turned in any direction, and is found in the flexible hose in the invention of Taggart, or the ball and socket joint of the telescopic pipe of the Von Schmidt patent. Similar valves to those found in the pneumatic tube are found in the pneumatic tubes in the patent of L. Smith, 305,976. The exhaust chamber and wire screens of the claimant's patent are found in the air-tight box and wire gauze of the Beach patent. The means for conveying the cotton from the exhaust chamber to the gin, which is found in the specifications and in actual use in complainant's machine—i. e., the shaft upon which are affixed certain valves working in an air-tight box—is found in the receiving boxes of said Beach's patent. The exhaust fan for the purpose of producing the air current is found in the Penman, the Craven, the Pearce, the Taggart, and the Williams patents. The dust chimney is found in the conductor of the Craven machine. It appears, therefore, that every element found in the complainant's machine is found in a prior patent, and was well known to the art. His patent, therefore, must be treated as for a combination of well-known elements and devices."

The complainant, as has been stated, relies upon the decision by the Circuit Court of Appeals for the Third Circuit, in Murray Company

v. Continental Gin Company, 149 Fed. 989, 79 C. C. A. 499. I do not think that case should be considered as controlling authority in this case. It would be highly persuasive, of course, and would be followed if it involved the precise question for determination here. In that case two issues were made. The first was as to whether or not the Murray Company had shown title to its patent No. 472,-607, and the next was whether the Murray patent was anticipated by the Munger patent No. 308,790, dated December 2, 1884, the Sailor patent, No. 362,041, dated April 26, 1887; and the Schulze patent, No. 478,473, dated July 5, 1892, or, as expressed by the court in the opinion, "whether they narrowed the art to such an extent that the complainant's patent No. 472,607 must be narrowly and strictly construed in order to maintain its validity, and that thus construed the defendant's apparatus did not infringe claims 1, 2, and 12 thereof."

The court further says:

"The Schulze patent undoubtedly represents the highest development of the art prior to the Murray patent under consideration, and it was upon that patent that counsel for the defendant mainly relied to show anticipation. It is quite true that the Schulze and Murray machines are in some respect alike, and from a mere cursory examination they might seem to be so much alike that very little, if anything, of novelty or invention could be discovered in the Murray patent; but, when carefully examined, it will appear that, while the elements embodied in the Murray patent are old, they are nevertheless combined and organized in such a way as to accomplish a new and decidedly useful result. What Murray more especially claims by his patent is an automatic valve produced by the seed cotton itself, so that, when the cotton becomes choked in the chute, and fills it to the top of the screen walls, the air suction is entirely cut off, and the delivery of cotton to that particular chute is suspended until the stoppage of the chute is overcome, or, adopting the language of the patentee: 'When the cotton accumulates in the feeder too fast and reaches to the top of the screen-walls of the space 5, it is evident that the suction from pipe or tube 1 will be cut off and the cotton will cease to be drawn in; but, as soon as one or more of the feeders have fed out sufficient of the cotton to allow some part of the screen-walls to be free or open, the suction again becomes effective in the manner already explained.'"

It is true the court says that the evidence there showed that the Murray patent would produce the result described in the specification, but the issue there was not at all like the issue here, nor is the evidence in the cases alike, so far as can be gathered from the opinion. Here infringement is claimed by the Murray Company against the Van Winkle Company, but the evidence fails to show that in practical operation the Murray patent will work successfully or satisfactorily without the use of a trip valve to aid in the discharge of the cotton through the chute; and clearly, infringement being claimed against the Van Winkle Company, the burden would be on the complainant to maintain its case, and to show, as against the defence interposed, that its apparatus is one which is of practical use, and commercial value, and that it will do what is claimed for it, without the important addition made to the apparatus by the Van Winkle Company.

It seems from the evidence submitted in this case that, when testimony was first taken, the case was regarded as very much like the Continental Gin Company Case, supra, but that during the taking of testimony the parties respectively made the test alluded to, as

to the practical operation of the machine in actual use, and the result is that the case turns almost entirely upon the effect of such test and the evidence with reference thereto. The case of Dudley E. Jones Company v. Munger Machine Company, supra, decided by the Circuit Court of Appeals in this Circuit, pertinent as it is, in my opinion, to the issues made here, is at least as strong authority in this case as the Continental Gin Company Case. Judge Meek in the Texas case only granted a preliminary injunction. This certainly cannot be regarded as authority. If Judge Meek on the case made here by pleadings and proof had determined the matter, I should regard it as very high, and probably controlling authority. In view of what has been stated above, I do not think that the feed rollers as a part of complainant's combination should have any effect in the determination of the case. If the complainant has failed to sustain by the weight of the evidence its contention that the cotton would pass satisfactorily through the chute by gravity, and of its own weight, thereby overcoming the atmospheric pressure against the valves, aided by the screen at the top of the chute to relieve choking, then it is immaterial how effective a part of the combination the feed rollers may be. I do not understand that the claim is made that there is anything new about the feed rollers, except in combination with the other elements of the elevating apparatus.

The question of whether or not the Murray patent was anticipated by the Schulze patent has not been discussed, nor has the Munger patent or the Sailor patent as related to this case, because the case is controlled, in my opinion, by the actual and practical tests which have been referred to and discussed above.

I do not believe for the reason above stated that the complainant has maintained its claim of infringement against the defendant company, and it must be held, therefore, that defendant is entitled to a decree dismissing the bill, with costs.